UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :
                                                  :
In re                                             :    Chapter 7
                                                  :
THELEN LLP,                                       :    Case No. 09-15631 (ALG)
                                                  :
                Debtor.                           :
                                                  :
-------------------------------------------------- X
YANN GERON, as Chapter 7 Trustee of the           :
Estate of THELEN LLP,                             :
                                                  :    Adv. Pro. No. 11-02674 (ALG)
                Plaintiff,                         :
                                                  :
                                                  :
        -against-                                 :
                                                  :
Frederick Cohen,                                  :
                                                  :
                                                  :
                Defendant.                        :
                                                  :
------------------------------------------------------------X


## DEFENDANT'S MEMORANDUM OF LAW


Frederick Cohen, Pro Se (FC9855)
1540 Broadway
New York, New York 10036
Tel.: (212) 692-1000
Fax: (212) 692-1020
Email: fcohen@duanemorris.com

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND FACTS.................................................................................................1

QUESTIONS PRESENTED..............................................................................................8

POINT I .........................................................................................................................8

      THE TRANSFERS OCCURRED WHEN THE DEBTOR
      TRANSFERRED FUNDS TO THE DEFENDANT ........................................................ 8

POINT II.......................................................................................................................15

      A DETERMINATION OF REASONABLY EQUIVALENT
      VALUE REQUIRES AN ANALYSIS OF THE BENEFIT
      ACTUALLY RECEIVED BY THE DEBTOR ............................................................. 15

CONCLUSION..............................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

Angell v. Montague Farms, 2013 WL 1619390 (Bankr. E.D.N.C. 2013) .....................................11

Balabar Strauss v. Lawrence, 264 B.R. 303 (S.D.N.Y., 2001) ......................................................17

Barnhart v. Sigmon Coal Co., 534 U.S. 438 (2002) ........................................................................9

Barnhill v. Johnson, 503 U.S. 393 (1992) .....................................................................................10

Bessing v. Hawthorne, 981 F.2d 1488 (5th Cir. 1993) ..................................................................16

In re Best Prods. Co., Inc., 157 B.R. 222 (Bankr. S.D.N.Y. 1993) ..............................................13

Bigelow v. First American Bank, 956 F.2d 479 (4th Cir. 1992) ...................................................18

Citizens Bank of Clearwater v. Hunt, 927 F.2d 707 (2nd Cir. 1991) ...........................................15

Cooper v. Ashley Communications, Inc. (In re Morris Communications
    NC, Inc.), 914 F.2d 458 (4th Cir. 1990) ............................................................................ 16-17

Garcia v. Garcia, 494 B.R. 749 (Bankr. E. D N.Y. 2013) ...........................................................16

In Re Geltzer, Case No. 11-10219 (Bankr. S.D.N.Y. 2013) ...................................................16, 18

Geron v. Robinson & Cole, 11 Civ. 8967 (S.D.N.Y. 2012) .........................................................15

HBE Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir. 1995) ......................................................12, 14

HBE Leasing Corp. v. Frank, 48 F.3d 623,635 (2d Cir. 1995) ....................................................13

In Re High Strength Steel, 269 B.R. 560 (Bankr. Del. 2001) .......................................................11

In Re Jesup & Lamont, Inc. Case No. 10-14133 (Bankr. S.D.N.Y. 2014) ...................................18

In Re M. Fabrikant & Sons, 480 B.R. 480 (Bankr. S.D.N.Y. 2012) ............................................14

Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823 (5th Cir. 1959), cert.
    denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed. 2d 877 (1960) ................................................17

Mellon Bank v. Metro, 945 F.2d 635 (3rd Cir. 1991) ....................................................................16

Mills v. Everest Reinsurance Co., 410 F. Supp. 2d 243 (S.D.N.Y. 2006) ...................................14

In Re Morris Communications NC, Inc., 814 F.2d 458 (4th Cir. 1990) ........................................18

In Re Northlake Foods, 715 F.3d 1251 (11th Cir. 2013) ................................................17

Orr v. Kinderhill Corp., 991 F.2d 31 (2d Cir. 1993) .............................................. 12-13

Peltz v. Hatten, 279 B.R. 710 (D. Del. 2002) ...............................................................17

Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez), 342 B.R. 165 (Bankr.
      S.D.N.Y. 2006) ..................................................................................... 16-17

Perrin v. United States, 444 U.S. 37 (1979) .....................................................................9

Robinson v. Shell Oil Co., 519 U. S. 337 ..........................................................................9

In Re Rodriguez, 895 F.2d 725 (11 Cir. 1990) ..............................................................17

Rosen v. Barclay's Bank, 115 B.R. 433 (E.D.N.Y. 1990) ............................................18

In Re Sunbeam Corp, 284 B.R. 355 ................................................................................13

In Re TC Liquidations, 463 B.R. 257 (Bankr. E.D.N.Y. 2011) ...............................16, 18

In Re Tronox (Bankr. S.D.N.Y. Case No. 09-10156, 2013) ..........................................14

United States v. Tabor Realty Corp., 803 F.2d 1288 (3rd Cir. 1986) ...........................13

VFB LLC. v. Campbell Soup Co., 482 F.3d 624 (3rd Cir. 2007) ...................................18

Voest-Alpine Trading USA, Corp. v. Vantage Steel Corp., 919 F.2d 206
      (3rd Cir. 1990) ...................................................................................... 12-13

In Re Waterford Wedgewood USA, Inc., Case No. 09-12512 (Bankr.
      S.D.N.Y. 2013) ...........................................................................................16

**Statutes**

11 U.S.C. § 101(54) ...................................................................................................9, 11

11 U.S.C. § 548(a)(i)(B) .............................................................................................8, 15

11 U.S.C. § 548(a)(2) ......................................................................................................17

Section 272 of the New York Debtor and Creditor Law ................................................15

**Other Authorities**

S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), reprinted in 1978
      U.S.C.C.A.N. 5787 ......................................................................................10

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted in opposition to the Trustee's motion for summary judgment in which he seeks (i) to create a <u>fictional</u> "transfer" date for the purpose of determining the existence of a fraudulent transfer and (ii) to have this Court declare that the Debtor's Partnership Agreement established a formula for determining "Reasonably Equivalent Value" rather than to determine the actual economic benefit given to the Debtor in exchange for the transfer.

## BACKGROUND FACTS

The relevant facts and documentation necessary for disposition of this motion are fully set forth in the Affidavit of Frederick Cohen, duly sworn to the 4th day of April 2014, (the "Cohen Affidavit") and in the exhibits annexed thereto. Those facts are briefly summarized below for the convenience of the Court.

On February 1, 2006, Defendant, after twenty-seven years of practicing law as co-founding Partner in the firm of Ross & Cohen LLP ("R & C")[1], R & C merged its law practice of fifteen attorneys with the firm of Brown Raysman Millstein Felder & Steiner LLP ("Brown Raysman"). (Cohen Aff. ¶ 1)

In the early summer of 2006, even before the fifteen R & C lawyers who had moved to Brown Raysman had fully unpacked and integrated, Brown Raysman announced that it was in serious merger discussions with the law firm of Thelen Reid & Priest. (Cohen Aff. ¶ 2)

---

[1] R&C was a well-known and highly regarded boutique firm specializing in construction law.

On December 1, 2006, the merger of Brown Raysman and Thelen Reid & Priest was consummated and the new law firm was known as Thelen Reid Brown Raysman & Steiner ("TRBRS"). (Cohen Aff. ¶ 3)

As part of the merger transaction, Defendant's existing employment agreement and guaranteed compensation with Brown Raysman was assumed and honored by TRBRS. Additionally, Defendant was required to agree, and did agree, to defer $100,000 of his guaranteed compensation for 2006. This deferred sum was to be paid by TRBRS over a seven year period commencing in 2007 ("Deferred Compensation") in accordance with the schedule of payments issued by the Debtor (Exhibit "A").[2] Nonetheless, Defendant has not received any part of the Deferred Compensation. (Cohen Aff. ¶ 4)

From December 1, 2006 through October 27, 2008, the affairs of TRBRS, whose name was subsequently changed to Thelen LLP ("Thelen") were governed by the Third Amended and Restated Limited Liability Partnership Agreement (Cohen Aff. ¶ 5; Exhibit "B").

From and after October 28, 2008, the affairs of Thelen were governed by the Fourth Amended and Restated Limited Liability Partnership Agreement. The Third and Fourth Amended and Restated Partnership Agreements are hereafter referred to as the "Partnership Agreement". (Cohen Aff. ¶ 6; Exhibit "C").

Section 5.2 of the Partnership Agreement established a "Partnership Council" composed of eighteen individuals who functioned "as a broad policy making body of the Partnership" (akin to a Board of Directors). Neither Defendant nor Allen Ross ("Ross", the other name Partner of Ross & Cohen) was a member of the Partnership Council. (Cohen Aff. ¶ 7)

---

[2] References to Exhibits are those attached to the Affidavit in Opposition of Defendant, Frederick Cohen.

Section 5.2.4 of the Partnership Agreement established an eleven (11) member "Partner Compensation Subcommittee" of the Partnership Council. Neither Defendant nor Ross was a member of the Partnership Compensation Subcommittee. (Cohen Aff. ¶ 8)

Defendant's equity interest in the Debtor was 0.64%. Ross' equity interest in the Debtor was 0.64%. (Cohen Aff. ¶ 9; Schedule 1, Exhibit "B")

Neither Defendant nor Ross was the Chair of any practice group or held any firm-wide supervisory, management or executive role. (Cohen Aff. ¶ 10)

At the time of the merger, neither Defendant nor Ross had any capital investment in the Debtor. (Cohen Aff. ¶ 11)

In the fall of 2007, the Managing Partner of TRBRS, Steven O'Neal, through John Heisse, the Chair of the Construction Practice Group and member of the Partnership Council, advised Defendant that they were unaware of the existing guaranteed compensation agreement for Defendant and Ross and stated that TRBRS would not honor it unless it was restructured. (Cohen Aff. ¶ 12)

By letter dated May 2, 2008, TRBRS proffered a draft agreement governing Defendant's compensation and the compensation of Ross based upon certain agreed-upon personal performance targets. (Cohen Aff. ¶ 13; Exhibit "D").

Defendant and Ross rejected this proposal because it did not provide for an "equitable adjustment" in the event the stated personal performance targets were not met. (Cohen Aff. ¶ 14)

Thereafter, however, Defendant and TRBRS entered into a letter agreement dated May 29, 2008, (the "Letter Agreement"), pursuant to which TRBRS confirmed the pre-existing agreement for a set amount of guaranteed compensation for 2007 and set forth a binding

3

compensation formula for 2008 based upon specified personal performance targets that were

unrelated to firm profitability. (Cohen Aff. ¶ 15; Exhibit "E"). [3]

In early July 2008, TRBRS announced to its partners that it intended to seek another

merger partner. (Cohen Aff. ¶ 16)[4]

On October 28, 2008, the Debtor's partners voted to dissolve the firm and wind up

Thelen's business under a written Plan of Dissolution. Thelen ceased practicing law on

November 30, 2008. (Cohen Aff. ¶ 17)

On September 18, 2009, the Debtor filed a voluntary petition under Chapter 7 of Title 11

of the United States Code. (Cohen Aff. ¶ 17)

The Letter Agreement (Exhibit "E") states that Defendant is an Equity Partner with 21

points (Section 1.1). This point-based compensation is modified by Section 2.1, which states as

follows:

> 2.1. For each of 2008 and 2009, you will be paid as
> supplemental compensation, provided your performance
> satisfies the criteria stated below, an amount sufficient, in
> addition to your point based-compensation for that calendar
> year, to bring your total base compensation to $700,000.
> Provided that your performance satisfies the criteria set
> forth in paragraph 2.7 below, payment of such
> supplemental compensation will be made at the same time
> and in the same manner that payment of the final
> distribution of profit participation for the prior year is made
> to equity partners under the cash management policy then
> in effect. If your performance does not satisfy the criteria
> set forth in paragraph 2.7, then supplemental or incentive
> compensation, if any, to be paid in accordance with the
> provisions of this agreement will be paid at the same time

---

[3] An identical Letter Agreement of the same date was executed by TRBRS and Ross.

[4] See Paragraph 13 of the Amended Complaint.

4

as bonuses are paid to other partners, generally in March or
April of the following year.  (Cohen Aff. ¶ 18)

Section 2.7.1 of the Letter Agreement, which describes the applicable performance

targets, covers the calendar year 2008 and reads as follows:

> 2.7.1.  For 2008, in order to qualify for the supplemental
> compensation and the incentive compensation, you must be
> a partner in good standing on December 31, 2008, and all
> three of the following criteria must be satisfied.  (a) the
> combined creditable billable hours for you and Allen Ross
> must exceed 1,600; (b) the overall (billing and collection)
> realization for non-contingency matters on which either
> you or Allen Ross are the Matter Billing Attorney
> ("MBA") must not be less than 80%; and (c) the MBA Fee
> Collections received during the calendar year from matters
> for which either you or Allen Ross are the MBA must
> exceed $4.5 million.  (Cohen Aff. ¶ 19)

The Letter Agreement in paragraph 2.8 provides:

> However in the event that unforeseen events beyond your control
> (such as poor health or the like) impair your ability to satisfy these
> criteria, the Office of the Chair will equitably adjust the
> supplemental or incentive compensation provided for under this
> Agreement.  (Cohen Aff. ¶ 20)

Based upon the Debtor's own records, for the year 2008 up to November 30, when

Thelen ceased practicing law, Defendant had 837 creditable billable hours (Exhibit "F") and

Ross had 363 creditable billable hours (Exhibit "G") for a total of 1200 creditable billable hours

for the eleven month period.  (Cohen Aff. ¶ 21)

Based upon the Debtor's own records, for the year 2008, the overall MBA (Matter Billing

Attorney) Fee Collections for matters on which Ross was the MBA was $3,484,342 and matters

on which Defendant was the MBA was $2,178,551, for a total of $5,662,893.  (Cohen Aff. ¶ 22;

Exhibit "H").

5

Based upon the Debtor's own records, for the year 2008, the collection realization for matters on which Defendant was the MBA was 98.4% and the collection realization for matters on which Ross was the MBA was 95.7%.  (Cohen Aff. ¶ 23; Exhibit "H").

The target criteria as set forth in the Letter Agreement and the actual results achieved may be summarized as follows:

|   | Target | Actual |
|---|---|---|
| a.  Total Billings | $4.5 Million | $5.6 Million |
| b.  Realization Rate | 80% | 97% (Average) |
| c.  Hours Billed | 1600 | 1309 (Annualized) |
| (Cohen Aff. ¶ 24) | | |

Between July 1, 2008 and November 11, 2008, Defendant and Ross each spent 93 hours meeting with other law firms in Atlanta, Chicago, Philadelphia, Washington, D.C., as well as New York, to discuss moving the entire New York Construction Group that had practiced at Thelen.  (Cohen Aff. ¶ 25)

Between July 1, 2008 and November 11, 2008, Defendant and Ross each spent 50 hours relating to moving the New York Construction Group through intra-office partner meetings, telephone calls and meetings with headhunters and reviewing law firm merger partners' financial information.  (Cohen Aff. ¶ 26)

In November 2008, Defendant and Ross each spent 30 hours on the following tasks: packing, conferences and telephone conversations with clients, reviewing files to be transferred, preparing client authorization for file transfer and preparing Consent To Change Attorneys for litigation matters.  (Cohen Aff. ¶ 27)

On December 1, 2008, Defendant and Ross moved their boutique construction industry practice to, and became partners of, Duane Morris, LLP. This included sixteen other lawyers plus support staff. (Cohen Aff. ¶ 28)

From January 1, 2008 through November 30, 2008, the date Debtor ceased the practice of law, Defendant and Ross received semi-monthly draw payments of $10,500, plus two additional payments in March and June. For the calendar year of 2008, Defendant and Ross were each credited with distributions from the Debtor in the amount of $262,500. (Cohen Aff. ¶ 29; Exhibit "I").

Defendant filed a Proof of Claim (Exhibit "J") against the Estate in the amount of $493,000.00 and an amended Proof of Claim (Exhibit "K") in the sum of $537,500. This sum is comprised of the difference between the agreed upon compensation required by the Letter Agreement of $700,000 less the $262,500 paid by the Debtor or $437,500, plus the $100,000 in unpaid Deferred Compensation. (Cohen Aff. ¶ 30).

Based on the uncontroverted facts and documentation, it is clear that Defendant and Ross complied with the target criteria described in the Letter Agreement, taking into account the adverse situation created by the Debtor's financial situation from the period commencing on or about July 1, 2008. However, even if the Court determines that the 13% shortfall in the number of hours billed cannot be made up by the necessary time expended in transitioning eighteen lawyers to another firm, Defendant nevertheless, respectfully submits that there has been more than "substantial performance" taking into account that (i) total billings and collections exceeded the target by $1.1 million and the significantly higher than required realization rate on those billings and collections and (ii) the Letter Agreement itself requires an "equitable adjustment" in the event of unforeseen circumstances. (Cohen Aff. ¶ 31).

7

The background facts recited above will help the Court understand the frustration Defendant has experienced in dealing with the Trustee and the irresponsible and unsupportable legal positions he has asserted given these uncontested facts. This frustration is compounded by the fact that the Complaint, the Amended Complaint, the Trustee's Memorandum of Law and the Trustee's Statement of Undisputed Facts make no reference to the Letter Agreement, despite the fact that at all times during the pendency of this adversary proceeding, the Trustee was fully aware of its existence. (Cohen Aff. ¶ 32, 36).

## QUESTIONS PRESENTED

1.   When did the "transfer" to Defendant occur –

  (i)    On the date funds were actually transferred by the Debtor to the Defendant; or

  (ii)   On the "Netting Date" as urged by the Trustee.

2.   What is the standard for determining "Reasonably Equivalent Value" –

  (i)    The amount determined by the Trustee that Defendant earned under the Partnership Agreement as urged by the Trustee; or

  (ii)   The amount determined by the Court that Defendant earned under the Letter Agreement; or

  (iii)  The quantifiable and actual value received by the Debtor in exchange for the transferred funds as determined by the Court.

## POINT I

### THE TRANSFERS OCCURRED WHEN THE DEBTOR TRANSFERRED FUNDS TO THE DEFENDANT

#### i.    **The Statute**

The starting point in determining the existence of a Constructive Fraudulent Conveyance under 11 U.S.C. § 548(a)(i)(B) is the language of the statute itself, which (insofar as applicable

to the facts of this case) permits the Trustee to avoid a transfer of the debtor's property if the

debtor:

> "(B)(i) received less than a reasonably equivalent value in
> exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date such transfer was made...."

11 U.S.C. § 101(54) in turn defines the term "transfer" to mean:

> "(D) each mode, direct or indirect, absolute or conditional,
> voluntary or involuntary, of disposing of or parting with
>
>> (i)  property; or
>> (ii) an interest in property"

The language of the statute is plain and simple and must be read in accordance with its

plain and unambiguous meaning. Indeed, in Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450

(2002), the U.S. Supreme Court stated:

> "As in all statutory construction cases, we begin with the
> language of the statute. The first step "is to determine whether
> the language at issue has a plain and unambiguous meaning with
> regard to the particular dispute in the case." Robinson v. Shell
> Oil Co., 519 U. S. 337, 340 (1970 (citing United States v. Ron
> Pair Enterprises, Inc., 489 U. S. 235, 240 (1989)). The inquiry
> ceases "if the statutory language is unambiguous and 'the
> statutory scheme is coherent and consistent.'" 519 U. S., at 340."

Moreover "[a] fundamental canon of statutory construction is that, unless otherwise

defined, words will be interpreted as taking their ordinary, contemporary, common meaning."

Perrin v. United States, 444 U.S. 37, 42 (1979).

The legislative history of the term "transfer" confirms its breadth:

> "A transfer is a disposition of an interest in property. The
> definition of transfer is as broad as possible. Many of the
> potentially limiting words in current law are deleted, and the
> language is simplified. Under this definition, any transfer of an

9

> interest in property is a transfer, including a transfer of
> possession, custody, or control even if there is no transfer of title,
> because possession, custody and control are interests in property.
> <u>A deposit in a bank account or similar account is a transfer.</u>"
> (Emphasis added) S.Rep. No. 989, 95th Cong., 2d Sess. 27
> (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5813.

All of the transfers at issue concededly occurred between January and October of 2008 via direct deposit by the Debtor into Defendant's bank account. (Cohen Aff. ¶ 29)

In <u>Barnhill v. Johnson</u>, 503 U.S. 393 (1992), the United States Supreme Court held that for purposes of payment by ordinary check, a "transfer" occurred on the date of honor by the bank on which the check was drawn.

In this case the transfers took place when the funds were electronically transferred from the Debtor's account at Citibank to the Defendant's account at Citibank.

Accordingly, Plaintiff must establish that the Debtor received less than reasonably equivalent value in exchange for these payments and that the Debtor was insolvent at such time.

ii.    **The Trustee's "Netting" Fiction**

The Trustee, ignoring the existence of the  Letter Agreement, asserts that Defendant received draws in 2008 "in excess of the Defendant's entitlement to such payments under the Debtor's Partnership Agreements."  That excess, described by the Trustee as the "Overcompensation Payment" (Amended Complaint, Paragraph 48), could not be determined until "the end of 2008 based on the terms and conditions of the Partnership Agreements" (Amended Complaint, Paragraph 33).

Thus, the Trustee seeks to ignore the actual transfer dates in 2008 by creating another and equally unsupportive fiction based upon a "Netting Date." (See Paragraph 11 of the Knechtel Affidavit submitted on behalf of the Trustee).  As will be demonstrated below,  the Trustee's argument is not supportable by the incontrovertible facts and is totally inconsistent with both the

10

plain language of the statute and established precedent; nor can it be supported by a good faith argument for extending, modifying or reversing existing law or for establishment of new law.

It is important to note that there is nothing in the Partnership Agreement expressly or impliedly, which requires a partner to repay the firm for draws exceeding that partner's ultimate allocable share of net income. (See Section 4.2 of the Partnership Agreement) Thus, there is no basis for applying the so-called "Netting" theory. This "netting" is also irrelevant in this adversary proceeding as Defendant's compensation was governed by the Letter Agreement and not the point system described in the Partnership Agreement.

In Angell v. Montague Farms, 2013 WL 1619390, (Bankr. E.D.N.C. 2013), relied upon by the Trustee, the Bankruptcy Court for the Eastern District of North Carolina held that an "offset" or a withholding of funds due to a debtor constitutes a "transfer" within the meaning of 11 U.S.C. § 101(54). Specifically, the Court held that "a 'transfer' occurs for purposes of § 101 54(D) and § 548 when funds owed to the debtor, or a portion thereof are involuntarily retained by a third party." If one were to apply this reasoning to the case at bar, the transfer of funds to the Defendant was made in each instance when the funds were deposited in Defendant's bank account and simultaneously "retained by the Defendant." While Defendant does not agree with the Trustee's analysis, the Trustee's reliance on this case is misplaced as the case actually supports the Defendant's position that the transfer occurred when the funds changed hands and were retained by Defendant.

Reliance by the Trustee on In Re High Strength Steel, 269 B.R. 560 (Bankr. Del. 2001), is equally unavailing. In this case, the Court held that in a series of transactions between interrelated entities, the transfer of an obligation from one to the other constituted a "transfer" within the meaning of the Delaware Fraudulent Conveyance Act. Here, again, the "transfer"

occurred when the adjustment was mutually made by both the Debtor and the Transferee.

In the case at bar, the Trustee seeks to use this "netting" to create a fraudulent conveyance, rather than set aside a fraudulent conveyance.

### iii.    The "Integrated Transaction" Doctrine

The Trustee alternatively argues that the monthly draws were in effect one transaction to which the "integrated transaction" doctrine applies, and argues that the alleged integrated transaction was not completed until December 31, 2008.  (See Page 11, Trustee's Memorandum of Law)

As will be demonstrated below, the Trustee's theory is without precedent and has no legal or factual basis.  The Trustee has created this theory because he either cannot or does not choose to rely upon the actual transfer date to establish the quantifiable and actual value received by the Debtor in exchange for such transfer, or because he cannot demonstrate insolvency before December 2008 and would be barred from seeking the recoveries he has sought from so many individuals.

The "Integrated Transaction" doctrine is usually applied by Courts in multi-party transactions to determine if the transferor debtor or bankrupt has received reasonably equivalent value. It is not applied, as the Trustee would have us believe, to create a fictitious transfer date or a determination of reasonably equivalent value based upon a fictitious mathematical formula.

There is no question that "an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications" Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993).  See also, HBE Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir. 1995)

For example in Voest-Alpine Trading USA, Corp. v. Vantage Steel Corp., 919 F.2d 206 (3rd Cir. 1990), the Court held that a number of simultaneous separate transactions functioned as

12

a subterfuge and could be viewed as a single fraudulent transaction in violation of the Uniform

Fraudulent Conveyance Act.

In <u>United States v. Tabor Realty Corp.</u>, 803 F.2d 1288 (3rd Cir. 1986), the Court held a

series of loan and repayment schemes constituted one integrated transaction in order to assess

whether the loan was a fraudulent conveyance.

In <u>In Re Sunbeam Corp</u>, 284 B.R. 355, 370 (Bankr. S.D.N.Y. (2002), Bankruptcy Judge

Gonzalez summarized the applicability of the "integrated transaction" theory as follows:

> "A series of transactions may, under certain circumstances, be
> "collapsed" and treated as a single transaction for the purpose of
> determining whether there has been a fraudulent conveyance.
> <u>HBE Leasing Corp. v. Frank, 48 F.3d 623,635 (2d Cir. 1995)</u>.
> This treatment is usually accorded in situations where a debtor
> who has exchanged property with another for fair consideration
> then gratuitously transfers that consideration to a third-party. *Id.*
> When the series of transactions are completed, the debtor
> remains with nothing while the counter-party to the first
> transaction receives the property and the counter-party to the
> second transaction receives the consideration. *Id.*
>
> Although the concept of "collapsing" a series of transactions and
> treating them as a single integrated transaction has been applied
> primarily when analyzing a transfer alleged to be fraudulent in
> the context of a failed leveraged buy-out ("LBO"), it has also
> been utilized in other contexts. <u>In re Best Prods. Co., Inc., 157
> B.R. 222, 229-30 (Bankr. S.D.N.Y. 1993)</u> (citing LBO cases,
> then collapsing sublease between subsidiary and parent
> corporation which was used as mere financing vehicle and
> treating loan as having been made directly to parent corporation);
> see also, <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31, 36-36 (2d Cir.
> 1993) (collapsing transactions concerning corporation's
> (i) transfer of real property, and (ii) subsequent distribution of
> stock in transferee corporation, and treating integrated
> transaction as not supported by fair consideration; See also,
> <u>Voest-Alpine Trading Corp. v. Vantage Steel Corp., 919 F.2d
> 206, 212-13 (3d Cir. 1990)</u> (collapsing series of transactions as
> "sham" where transactions were designed to deprive a
> company's unsecured creditors of access to its assets by
> rendering company insolvent through foreclosure and
> transferring its assets to another company without fair

consideration)."

See also, In Re M. Fabrikant & Sons, 480 B.R. 480, 487 (Bankr. S.D.N.Y. 2012), ("In

order to bring a collapsing fraudulent conveyance claim, a plaintiff must identify a set of

transfers that can be said to constitute a unified scheme to defraud creditors of the debtor").

The monthly draw payments made by the Debtor to the Defendant and all other partners

were not a subterfuge, a scam or some type of scheme to defraud creditors, but payments made

in the ordinary course of business as part and parcel of Debtor's long standing policy for

payment to partners.  (Cohen Aff. ¶ 42)

There was no deviation from the prior course of dealings between the Debtor and the

Defendant.  The monthly payments from the Debtor to Defendant were not extraordinary;

essentially the same amount was paid each month.  The manner of payment – direct electronic

deposit, was the same each month.  None of the payments occurred as a result of any pressure by

Defendant upon the Debtor.  There was nothing unique about the manner or timing of the

payments.  In short, there was no "scheme" created by the Debtor and the Defendant to make

semi-monthly draw payments, as this was a long-standing standard practice.  (Cohen Aff. ¶ 43)

See, In Re Tronox, (Bankr. S.D.N.Y. Case No. 09-10156, 2013).

Moreover, where the funds are ultimately used for legitimate business purposes, the

transfer is not fraudulent even if a series of transactions are viewed as a single integrated

transaction.  See, HBE Leasing Corp. v. Frank, 48 F.3d 623, 635. (2d Cir. 1995)  In this

connection, it should be noted that Defendant's compensation is "performance based" for

services rendered and not dependent on the law firm's profitability.

In Mills v. Everest Reinsurance Co., 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006), the

Court held that the integrated transaction exception whereby multiple transfers are collapsed into

14

one transaction for determining whether the transferor has received reasonably equivalent value "has never been invoked for the purpose of determining whether a fraudulent conveyance claim is or is not timely under a statute of limitations. Indeed, because a new claim for fraudulent conveyance accrues at the time of each conveyance, it would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitation was triggered". Here, although the Trustee is not trying to find a way around a limitation problem, he is trying to find a way around a date of insolvency problem.

In sum, the "integrated transaction" theory is applied by the courts to determine whether there has been a fraudulent conveyance or if the transferor/debtor received "reasonably equivalent value" not for the purpose of creating an artificial insolvency date or an artificial transfer date.

**POINT II**

**A DETERMINATION OF REASONABLY EQUIVALENT VALUE REQUIRES AN ANALYSIS OF THE BENEFIT ACTUALLY RECEIVED BY THE DEBTOR**

Section 548(a)(1)(B) of the Bankruptcy Code permits the Trustee to avoid any transfer, if while the Debtor was insolvent, it received less than "reasonably equivalent value" in exchange for such transfer.

Under Section 272 of the New York Debtor and Creditor Law, the Trustee must show that the transfer was made without "fair consideration".[5]

---

[5] While both the Complaint and Amended Complaint assert fraudulent conveyance claims under California law, the Trustee and his various counsel have chosen to ignore Second Circuit precedent, which holds that "A fraudulent conveyance is governed by the law of the State in which the property is located." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707 (2nd Cir. 1991). The Trustee has also ignored a similar holding in this very bankruptcy proceeding. See, Geron v. Robinson & Cole, 11 Civ. 8967 (S.D.N.Y. 2012).

"Reasonably equivalent value" and "fair consideration" are used interchangeably for purposes of analyzing claims based upon a constructive fraudulent conveyance. Garcia v. Garcia, 494 B.R. 749, 808 (Bankr. E. D N.Y. 2013); In Re TC Liquidations, 463 B.R. 257 (Bankr. E.D.N.Y. 2011); In Re Geltzer, Case No. 11-10219 (Bankr. S.D.N.Y. 2013).

The Bankruptcy Code does not define "reasonably equivalent value" but courts make a factual finding "regarding the value of the property transferred and the 'value' received in exchange" and that such finding depends on the "totality of the circumstances". Bessing v. Hawthorne, 981 F.2d 1488, 1495 (5th Cir. 1993)

In Ruben v. Manufacturers Hanover Trust Co., the Second Circuit held that:

> "if the debtor receives property... that is substantially equivalent in value to the property given... in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain." 661 F.2d 979, 991 (2nd Cir. 1981).

In Mellon Bank v. Metro, 945 F.2d 635, 647 (3rd Cir. 1991), the rule was described as follows:

> "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern before the transaction, reasonably equivalent value has been received."

In In Re Waterford Wedgewood USA, Inc., Case No. 09-12512, (Bankr. S.D.N.Y. 2013), the Court framed the inquiry as follows:

> "In contrast to its definition of "value," Congress left it to the courts to mark the scope and meaning of the term "reasonably equivalent." Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.), 914 F.2d 458, 466 (4th Cir. 1990). To determine reasonably equivalent value, courts examine the totality of the circumstances surrounding the transfer in question. *Id.* At 467; *see also Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez),* 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006). "The 'totality of the circumstances' inquiry considers three factors: (i) the fair

16

market value of the economic benefit received by the debtor; (ii) the arms-length nature of the transaction; and iii) the good faith of the transferee." *Gonzalez*, 342 B.R. at 173 (citing Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.J.L. (In re R.M.L), 92 F.3d 139, 149 (3d Cir. 1996)); *see also Morris Communications*, 914 F.2d at 467. Because fraudulent conveyance laws are intended to protect a debtor's creditors, the analysis of reasonable value must be determined from the creditors' standpoint. *See* Peltz v. Hatten, 279 B.R. 710, 736 (D. Del. 2002) (quoting Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646 (3d Cir. 1991"

In Balabar Strauss v. Lawrence, 264 B.R. 303, 307-8 (S.D.N.Y., 2001), the Court held

that:

"In order to determine 'if a fair economic exchange has occurred in a case of suspected fraudulent transfer, the bankruptcy court must analyze all the circumstances surrounding the transfer' 5 COLLIER ON BANKRUPTCY ¶ 548.05[1][b]. Value is present if the debtor receives a fair equivalent for its property or its obligation."

\* \* \*

The law requires that the Court evaluate the specific consideration exchanged by the debtor and the transferee in the specific transaction which the Trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law." Quoting In Re Churchill, 256 B.R. 664 at 680 (Bankr. S.D.N.Y. 2000).

In In Re Rodriguez, 895 F.2d 725, 727 (11 Cir. 1990) the Eleventh Circuit described the

analysis as follows:

"The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of the bankrupt's estate. 11 U.S.C. § 548(a)(2); Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 829-30 (5th Cir. 1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed. 2d 877 (1960). Therefore, this provision does not authorize voiding a transfer which 'confers an economic benefit upon the debtor,' either directly or indirectly."

In In Re Northlake Foods, 715 F.3d 1251, 1255-6 (11th Cir. 2013), the Court held:

"Where an economic benefit is present, the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer."

17

The Fourth Circuit defined the standard as follows:

> "Hence, the proper focus is on the net effect or the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred. <u>Bigelow v. First American Bank</u>, 956 F.2d 479, 484 (4th Cir. 1992). See also, <u>Fairchild v. Butler</u> Aviation, 6 F.3d 1119 (5th Cir. 1993)

As this Court recently held, the proper inquiry is whether there has been a "depletion of the Debtor's assets" as a result of the transfer. <u>In Re Geltzer</u>, supra. See also <u>In Re Jesup & Lamont, Inc.</u> Case No. 10-14133 (Bankr. S.D.N.Y. 2014) ("The key consideration is whether the debtor's net worth has been preserved.")

All of the above cited cases establish that "there is no precise formula which can be used to ascertain whether reasonably equivalent value has been given in exchange for a transfer." <u>Rosen v. Barclay's Bank</u>, 115 B.R. 433 (E.D.N.Y. 1990). Moreover, mathematical formulas for determining reasonably equivalent value should be rejected in favor of analysis of all the facts and circumstances. See, <u>In Re Morris Communications NC, Inc.</u>, 814 F.2d 458, 466-67 (4th Cir. 1990). A "common sense" approach is required. <u>VFB LLC. v. Campbell Soup Co.</u>, 482 F.3d 624, 631 (3rd Cir. 2007) Here, these principles lead to the conclusion that the Court must examine whether the draw payments at issue "were excessive in light of the Defendants' employment responsibilities" and the performance criteria established by the Letter Agreement. See, <u>TC Liquidations</u>, supra at 268.

While Defendant and Ross were "partners" in the Debtor, in light of their limited role at the firm and the arms-length negotiation of the Letter Agreement, they essentially functioned as salaried employees. Moreover, there has been no suggestion in this case that at all times Defendant did not act honestly, fairly, openly and in good faith when receiving the semi-monthly draw payments in accordance with Debtor's standard historical practice applied to every partner.

One brief hypothetical example will immediately expose the utter poverty of the Trustee's argument. Assume the partnership agreement contained a provision that Partner A was to receive $2 Million in annual compensation. Assume further that Partner A was in the office for 12 working days over the calendar year, had billable time totaling 50 hours and collections from clients totaling $5,000. Under the Trustee's theory, this would represent "reasonably equivalent value" because in the words of the Trustee "the Partnership Agreements supplied the method of determining the reasonably equivalent value of the Defendant's services." (Trustee's Memorandum of Law, Page 18)

The Trustee's reliance on the Partnership Agreement and a mathematical formula created for the purpose of this litigation, not only ignores the Letter Agreement, but is contrary to all established precedents for determining "reasonably equivalent value" and attempts to remove from the Court its fact-finding function in making such a determination. Indeed, the Trustee's formula is totally dependent upon the profitability of the Debtor, not upon the real and quantifiable efforts of the Defendant.

The common thread in all of the above-cited cases, is that there must be an assessment of the actual economic value received by the Debtor in exchange for the transfer and whether the payments received by the Defendant were disproportionately greater than the value received by the Debtor. Based upon the uncontroverted record and the Debtor's own books and records, just the opposite is true. The Debtor received tangible, concrete and quantifiable value far in excess of the compensation received by the Defendant.

Based upon any objective analysis, Defendant and Ross more than complied with the Letter Agreement. Collections exceeded the target by $1.1 million and the realization on collections of 97% significantly exceeded the target of 80%.

19

Based upon the performance described in paragraphs 22-24 of the Cohen Affidavit, (which, in turn, is confirmed by the Debtor's own records), the Trustee's position that Defendant and Ross each earned only $174,472 -- being the difference between what was paid ($262,500) and what the Trustee asserts were the funds received as a fraudulent conveyance ($88,028), is not supported by any objective standard.

In sum, the Trustee has (i) not addressed the question of whether and to what extent an economic benefit was conferred on the Debtor, (ii) essentially closed his eyes and ears to the uncontroverted facts, and (iii) refused to examine the actual (and more than reasonably equivalent) value received by the Debtor from Defendant and Ross. Instead, he has proceeded with scripted and predictable litigation to the detriment of both Defendant and the creditors of the Estate.

The complete lack of merit in the Trustee's position is underscored by the lengths to which he has gone in trying to stretch and avoid both the law and facts. Indeed, it is beyond rational dispute that Defendant gave far more than reasonably equivalent value in exchange for the transfers to him during the last year of the Debtor's existence.

## CONCLUSION

This Court should grant summary judgment in favor of Defendant, declaring as a matter of law that:

i. The transfers were made when funds were electronically transferred by Debtor to Defendant, not on the fictional "Netting Date" created by the Trustee;

ii. The determination of Reasonably Equivalent Value should be based either upon Defendant's substantial performance of the Letter Agreement and/or the totality of circumstances recognizing the economic benefit received by the Debtor; and

20

iii. The Debtor received more than reasonably equivalent value from Defendant in

exchange for the transfers.

Dated: New York, New York
April 10, 2014

**FREDERICK COHEN**

By: _____
Frederick Cohen, Pro Se (FC9855)
1540 Broadway
New York, New York 10036
Tel.:  (212) 692-1000
Fax:  (212) 692-1020
Email:  fcohen@duanemorris.com