**REID COLLINS & TSAI LLP**                         <u>Hearing Date</u>:
Angela J. Somers                                    **April 29, 2014 at 11:00 A.M.**
Jeffrey E. Gross
Anne M. Bahr
Yonah Jaffe
One Penn Plaza, 49th Floor
New York, New York  10119
212.344.5200 (telephone)

*Special Counsel for Yann Geron, Chapter 7 Trustee*
*of the Estate of Thelen LLP*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                              Chapter 7
                    THELEN LLP,
                              Debtor.
----------------------------------------------------------------X   Case No. 09-15631 (ALG)
Yann Geron, Chapter 7 Trustee of the Estate
of Thelen LLP,
                              Plaintiff,
          - v -                                     Adv. Pro. No. 11-02648 (ALG)
GARY L. FONTANA, *et al.*,
                              Defendants.
----------------------------------------------------------------X
Yann Geron, Chapter 7 Trustee of the Estate
of Thelen LLP,
                              Plaintiff,
          - v -                                     Adv. Pro. No. 11-02674 (ALG)
FREDERICK COHEN,
                              Defendant.
----------------------------------------------------------------X
Yann Geron, Chapter 7 Trustee of the Estate
of Thelen LLP,
                              Plaintiff,
          - v -                                     Adv. Pro. No. 11-02690 (ALG)
ALLEN J. ROSS,
                              Defendant.
----------------------------------------------------------------X
Yann Geron, Chapter 7 Trustee of the Estate
of Thelen LLP,
                              Plaintiff,
          - v -                                     Adv. Pro. No. 13-01444 (ALG)
GREGORY P. O'HARA,
                              Defendant.
----------------------------------------------------------------X

## REPLY TO MEMORANDA OF DEFENDANTS IN OPPOSITION TO
## TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## <u>AS TO THE DATE OF TRANSFER AND REASONABLY EQUIVALENT VALUE</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................................II

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL SUMMARY ............................................................................................................... 4

ARGUMENT ................................................................................................................................. 7

A.     The PAs Obligate the Defendants to Pay the Damage Amount on the Netting
       Date ................................................................................................................................... 8

B.     The Transfers Were Made Through the Netting Process................................................. 10

       1.     The Capital Account Calculation is Irrelevant to the Requested
              Determinations ..................................................................................................... 10

       2.     The WF Defendants Have Done Nothing to Refute the Applicability
              of the Trustee's Case Law Regarding the Date of the Transfer............................ 12

       3.     The WF Defendants Cannot Escape The Indebtedness Owed.............................. 14

C.     The Individual Value and Contributions of a Partner Are Reflected in the
       Point System and the PAs Determine the Value of Each Partner's Contribution ........... 18

CONCLUSION............................................................................................................................ 22

i

# **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ................................................................. 7

*Angell v. Montague Farms (In re Tanglewood Farms, Inc. of Elizabeth City)*
   No. 10-06719-8-JRL, 2013 WL 1619390 (Bankr. E.D.N.C. Apr. 15, 2013) ..................... 12, 13

*Annod Corporation v. Hamilton & Samuels*
   100 Cal. App. 4th 1286  (Cal. Dist. Ct. App. 2002) ................................................. 20

*Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*
   267 B.R. 71 (Bankr. D. Del. 2001) ..................................................... 14

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ................................................................. 7

*In re Nicholas*
   No. 07-73330, 2009 WL 1617098 (Bankr. E.D.N.Y. June 5, 2009) ......................... 7

*Official Comm. Of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*
   269 B.R. 560 (Bankr. D. Del. 2001) ................................................. 12, 13

*Sareen v. Port Authority of New York and New Jersey*
   No. 12-2823, 2013 WL 6588435 (S.D.N.Y. Dec. 16, 2013) ..................................... 8

**Statutes**

CUPA § 16306(d) ................................................................. 18

CUPA § 16807(b) ................................................................. 18

Yann Geron, as Chapter 7 trustee ( "**Trustee**") of Thelen LLP ("**Thelen**" or the "**Debtor**"), submits this Reply to (i) the Memorandum in Opposition ("**WF Opposition**") to the Trustee's Motion for Partial Summary Judgment ("**MPSJ**") on Behalf of the Whitmer-Fontana Defendants ("**WF Defendants**"), (ii) Defendant Gregory P. O'Hara's ("**O'Hara**") Opposition ("**O'Hara Opposition**") to the Trustee's MPSJ as to the Date of Transfer and Reasonably Equivalent Value under the Partnership Agreements, and (iii) Defendant's Memorandum of Law ("**Cohen Opposition**") submitted by Frederick Cohen[1] ("**Cohen**," and together with the WF Defendants and O'Hara, the "**Defendants**"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

The Trustee's case as set forth in his MPSJ is simple and straightforward. The Partnership Agreements ("**PAs**")[2] provided that (a) the fiscal year of the Debtor was the calendar year (Section 4.3), (b) each partner was entitled to a share of net income --Final ASNI[3]-- determined at the end of the calendar year (Section 4.1.1), (c) draw payments were periodically advanced to partners (Section 4.2.1), (d) a partner's Final ASNI was reduced by the draw payments the partner received and advances owed (Section 4.2.2), and (e) a netting process occurred at year end or when a partner departed from the firm, and the partner was then required to pay any deficiency owed (Section 6.6.3). Any partner who departed from the firm is a Former Partner, and in any event, the Trustee can expel a partner at any time (Section 6.4).

---

[1] Since Mr. Cohen's argument has been adopted by Mr. Ross, any reference in the reply to Cohen shall mean Mr. Ross and Mr. Cohen.

[2] The Defendants only discuss the Fourth Partnership Agreement in their Argument. This agreement is substantially similar to the Third Partnership Agreement, and thus, Defendants' use of one agreement or the other is largely irrelevant as to most provisions. Therefore, the Trustee will not raise the issue of which of the PAs apply. As to certain provisions that only appear in the Fourth Partnership Agreement, the Trustee agrees that those provisions apply post October 28, 2008 and will specify as such.

[3] Terms not otherwise defined herein are given the meaning set forth in the Trustee's MPSJ.

All of the Defendants left the firm after October 30, 2008, and the Debtor netted Draw Advances against the partner's Final ASNI for these Former Partners as of year-end on December 31, 2008—the Transfer Date. This netting resulted in a deficiency because the Draw Advances exceeded the Defendants' Final ASNI. Because Defendants are only entitled to their Final ASNI under the PAs, that is the REV of the services provided to the Debtor by Defendants.

Each Defendant group takes a different approach in challenging and confusing this straightforward analysis. Perhaps the most egregious example of this is the argument of the WF Defendants. Rather than addressing the pertinent issues, the WF Defendants present a plethora of immaterial and irrelevant facts and law. This is because the WF Defendants fail to understand (i) the Partnership Agreements and the terms used therein; (ii) the request of the Trustee in the MPSJ; and (iii) the relevant bankruptcy law that supports that request.

The WF Defendants begin by citing numerous provisions of the PAs that are wholly unrelated to the issues in this case. First, the WF Defendants evoke provisions of the PAs dealing with a partner's *capital account*. A partners' capital account has nothing to do with excess distributions, and instead, determined the amount that the WF Defendants were required to contribute as capital and the value of their equity interest in the firm. Second, the WF Defendants focus on provisions regarding *negative net income* and its treatment. The Trustee is simply not suing the Defendants for negative net income, since the transfer at issue occurred at the end of the year when the Debtor had positive net income. Third, the WF Defendants cite draconian tax rules applicable to negative net income and capital accounts. These allocation rules do not, in any way, wipe out the indebtedness of the WF Defendants. Fourth, the WF Defendants contend that Thelen's ability to distribute draws and Final ASNI *periodically*, translates into a prohibition against calculating or distributing a partners' Final ASNI at year end.

There is no support for this conclusion since in 2008, Final ASNI was calculated and netted by Thelen as of the calendar year end (Thelen's fiscal year), on the Netting Date, as was done in 2007. <u>Fifth</u>, the WF Defendants treat themselves as *current partners* of the firm by virtue of their "title" as Dissolution Partners. The WF Defendants have departed from the firm and ceased to practice law as partners of Thelen, and their responsibility to pay amounts due cannot be altered based on their title as Dissolution Partners. In any event, the Trustee has the power to expel them at any time. <u>Finally</u>, the WF Defendants ignore the PAs' definition of Liabilities and thereby mistake personal liability of a partner with *partnership liabilities* in order to elicit partnership provisions and California law. The excess the Trustee seeks to recover from the WF Defendants is a partnership asset, not partnership liability, and thus California law is inapplicable. Moreover, the special provisions of the PAs supersede California law.

Armed with this series of misinterpretations, the WF Defendants attempt to make their case. Nearly all of their discussion of the Transfer Date is erroneous due to the misuse of the terms as explained above, and should thus be rejected. As to REV, because the WF Defendants would likely have happily accepted their Final ASNI as payment for their services in the event that it exceeded their Draw Advances, the fact that it is now a disappointment should not alter the result. The WF Defendants' argument should therefore be rejected as self-serving and disingenuous, and this Court should find that REV is the Final ASNI.

With respect to O'Hara, his argument is based on the premise that the draw transfers were "perfected" each month. Mr. O'Hara seems to miss the point that, while each payment was completed, the date it was advanced is not relevant. Under the PAs, they were essentially subject to a clawback if Draw Advances exceeded Final ASNI. As a result, the Netting Process gave rise to the retention of value by O'Hara of more than reasonably equivalent value. That Netting

Process is thus a "transfer" for purposes of section 548 of the Bankruptcy Code. Likewise, Cohen's argument echoes the points made by O'Hara and the WF Defendants, except that he focuses on his side letter, an issue explicitly excluded from this motion with the consent of Cohen.

In contrast, the Trustee's request is well supported and clear; this Court should thus dismiss the numerous immaterial and irrelevant facts set forth in the WF Defendants' pleadings as well as their inapplicable legal arguments, and grant partial summary judgment in favor of the Trustee.

## FACTUAL SUMMARY

The Defendants seek to input immaterial and irrelevant facts into this process. Despite Defendants' attempt to confuse this Court and defeat the Trustee's MPSJ, the critical facts needed to prove the Trustee's case have been established.  They include the following:

- The Parties agree that effective December 1, 2006, the firm Thelen Reid Brown Raysman & Steiner LLP was formed through the combination of two firms and the Third Partnership Agreement was adopted by the Debtor. (Plaintiff's Statement of Undisputed Material Facts Pursuant to S.D.N.Y. Local Bankruptcy Rule 7056-1 ("**7056-1 Statement**") at ¶¶ 1,7; Defendant Gregory P. O'Hara's Response to 7056-1 Statement ("**O'Hara Response**")[4] at ¶¶ 1,7; Defendant's Response to 7056-1 Statement filed by Frederick Cohen ("**Cohen Response**") at ¶¶ 1,7; Response of the Whitmer-Fontana Defendants to the 7056-1 Statement ("**WF Response**") at ¶¶ 1,7).

---

[4] Mr. O'Hara has filed Objections to Evidence in Opposition to Motion for Summary Judgment, in which he attempts to challenge the evidentiary foundation of evidence submitted in support of the 7056-1 Statement.  The Trustee has separately responded to that objection, and the Trustee does not consider such facts disputed for purposes of this factual summary, where the only dispute asserted in the O'Hara 7056-1 Response is based on this evidentiary objection.

4

- The Parties agree that in September 2008, the firm changed its name to Thelen LLP. (7056-1 Statement at ¶ 2, O'Hara Response at ¶ 2; Cohen Response at ¶ 2; WF Response at ¶ 2)

- The Parties agree that in October 2008, the Debtor adopted the Fourth Partnership Agreement. (7056-1 Statement at ¶ 8, O'Hara Response at ¶ 8; Cohen Response at ¶ 8; WF Response at ¶ 8)

- The Parties agree that California law governs the construction, interpretation and effect of the PAs. (7056-1 Statement at ¶ 9, O'Hara Response at ¶ 9; Cohen Response at ¶ 9; WF Response at ¶ 9)

- The Parties agree the PAs are not ambiguous, since no party has argued to the contrary. The Parties also agree that, in limited circumstances, the PAs refer to other documents such as the procedures and policies as established by the firm, which are incorporated into the PAs. (7056-1 Statement at ¶ 13, O'Hara Response at ¶ 13; Cohen Response at ¶ 13; WF Response at ¶ 13)

- The Parties agree that (i) Draw Advances in some amount were paid throughout the calendar year in accordance with firm policy (7056-1 Statement at ¶ 15, O'Hara Response at ¶ 15; Cohen Response at ¶ 15; WF Response at ¶ 15); and (ii) Final ASNI was calculated in accordance with the PAs at some point in time. 7056-1 Statement at ¶ 2, O'Hara Opp. at 10; Cohen Opp. at 11; WF Opp. at 6-7.

- The PAs state that Final ASNI was netted against the Draw Advances and Loan Advances. The WF Defendants suggest that this practice was altered as to Loan Advances which were instead due directly from the partners.  (WF Opp. at 8).

- The Parties disagree as to whether or not this netting process has anything to do with a partner's capital account. The Trustee believes the calculation of a partner's capital account determines his or her equity interest in the firm. The WF Defendants believe that the Overcompensation (the Damage Amount) and Loan Advances can only be satisfied by a reduction in their capital accounts. (WF Opp. at 9, 16-17).  This can be determined in favor of the Trustee by a review of the PAs.

- The Parties disagree as to when a partner's Final ASNI was calculated and netted against their Draw Advances. The Trustee believes it was at the end of the 2008 calendar year. Defendants suggest it was done throughout the year because "allocations" were made, but they have not introduced any evidence that actual payments were made periodically during 2007 or 2008. The Trustee believes that this contention should be ignored under the summary judgment standards set forth below.  Mr. Mattioli's Statements are too vague to create a genuine dispute as to the Trustee's facts, and the Defendants have offered only conclusory testimony to refute the evidence submitted by the Trustee.  It is unclear whether Mr. Mattioli is speaking of the firm's conduct prior to December 2006 when the Third Partnership Agreement came into effect, and he offers nothing other than his bald statements.  In contrast, the Trustee has presented the Second Knechtel Affidavits.  After a forensic review of the books and records of Thelen, Mr. Knechtel concluded that, in 2007, the calculation of Final ASNI minus Draw Advances and Loan Advances was done as of year end as was the case in 2008.

- The Defendants do not dispute that, if Defendants are Former Partners, they owe the Overcompensation and Loan Advances. The Parties agree that the Defendants were partners at least until their departure in November 2008. The Trustee contends, upon their

departure, they became Former Partners under the PAs effective December 31, 2008, for

tax purposes. The WF Defendants contend that because they were called Dissolution

Partners, they are still current partners. (WF Opp. at 5-6). O'Hara and Cohen do not

contend that they are current partners. The Trustee believes, in any event, his right to

expel them from Thelen effective on any date can clarify that they are Former Partners.

This can be determined in favor of the Trustee by a review of the PAs.

- The Parties disagree as to whether the reasonably equivalent value of their services is

  determined by the PAs and calculation of a partner's Final ASNI or by some other

  measure of value. The Parties agree that the PAs were entered into on an arms-length

  basis and in good faith. (7056-1 Statement at ¶ 22, O'Hara Response at ¶ 22; Cohen

  Response at ¶ 22; WF Response at ¶ 22). This can be determined in favor of the Trustee

  as it is a legal issue.

Other facts that are not in dispute are incorporated by reference as if fully set forth herein.

## ARGUMENT

It is well settled that summary judgment will be awarded when there is no *genuine* issue

of *material* fact, and the prevailing party is entitled to judgment as a matter of law. *Celotex

Corp. v. Catrett*, 477 U.S. 317 (1986) (emphasis added). "A 'material' fact is one 'that might

affect the outcome of the suit under governing law,' and a 'genuine' issue is one for which 'the

evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *In re

Nicholas*, No. 07-73330, 2009 WL 1617098, at *2 (Bankr. E.D.N.Y. June 5, 2009) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Moreover, when statements are

supported by testimonial or documentary evidence, and denied by a conclusory statement by the

other party without citation to conflicting evidence, the Court should find such facts to be true.

*Sareen v. Port Authority of New York and New Jersey*, No. 12-2823, 2013 WL 6588435, at *1

n.1 (S.D.N.Y. Dec. 16, 2013).  In this case, Defendants raise a number of conclusory allegations

in an attempt to create triable issues of fact to defeat the Trustee's partial summary judgment

motion.  However, this Court should recognize that these conclusory allegations, in the face of

the documentary evidence put forth by the Trustee, are not credible enough for a reasonable fact

finder to return a verdict for the Defendants and as such, partial summary judgment is warranted.

A.      **The PAs Obligate the Defendants to Pay the Damage Amount on the Netting Date**

Pursuant to section 4.3 of the PAs, the fiscal year of the Debtor was the calendar year.

Thus, under section 4.1.1 of the PAs "[n]et Income of the Partnership for each calendar year or

relevant portion thereof" was "allocated to the Partners in proportion to their Sharing Ratios."

This was how and when the Defendants Final ASNI was determined.

The partners of Thelen also received Draw Advances in advance of this year-end

calculation.  Section 4.2.1 of the PAs states that "[e]ach Partner shall be entitled to receive a

draw as an advance against such Partner's share of Net Income of the Partnership on a periodic

basis."  The draw payments that the partners received were routine, bi-monthly payments, with

the exception of two special payments uniform to all partners.

According to section 4.2.2 of the PAs, a partner's Final ASNI was netted against his or

her advances as follows: "The Partnership shall distribute to the Partners from time to time, in

proportion to their Sharing Ratios, all or a portion of the Net Income of the Partnership, reduced

by prior draws or other advances against Net Income paid to such Partners pursuant to Section

4.2.1 under a policy determined from time to time by the Office of the Chair."

Because the Final ASNI was reduced by the Draw Advances and Loan Advances made,

if Final ASNI was less than those advances, a negative number would be produced.  This

deficiency was paid upon the partner's departure.  Section 6.6.3 of the PAs provides "[t]he

8

Partnership shall be entitled to recover any amount owed to it by a Former Partner on the date

such Partner ceases to be a Partner." In addition to permitting repayment by offset, the PAs

provide "[u]nless otherwise agreed, the excess, if any, of such amount over the amount otherwise

payable to such former Partner *shall become payable immediately on the date such Former*

*Partner ceases to be a Partner.*"

All the Defendants left the firm after October 30, 2008, and they currently have no

involvement in the firm whatsoever.[5] Because the firm was a pass-through entity, certain tax

consequences lingered after their departures, but the Defendants have otherwise severed all

relations with the firm. Further, under section 6.4 of the PAs, the Trustee can expel the partners

with or without cause and clarify that departure. It is thus clear that the Defendants are Former

Partners.

In addition, section 7.4.5.1 of the Fourth Partnership Agreement provides that creditors'

claims and other known Liabilities of the firm will be paid before Partners will receive a

distribution.[6] Therefore, retention of the Overcompensation and Loan Advances is akin to taking

an improper distribution in violation of this provision.

---

[5] Even if the Defendants were current partners, that would not relieve them of the responsibility to pay these amounts, and there would be an implied obligation under section 6.6.3 of the PAs. As is clear from Defendants' pleadings, no provision in the PAs exists that supports their claim that they were released of this obligation.

[6] It should be noted that even the calculation of the Final ASNI is based upon Thelen's status as a modified cash basis tax payer. This status enabled the firm to avoid including any expenses in its income statement, unless such expenses were actually paid. If such expenses had been included, the income statement would have shown that the Debtor was clearly insolvent, as has been nearly admitted to by Defendants. Therefore, a net income statement that accounted for such expenses would have led to a finding that there was no net income available for distribution to Partners.

**B.**     **The Transfers Were Made Through the Netting Process**

    1.     **The Capital Account Calculation is Irrelevant to the Requested Determinations**

Unfortunately, the WF Defendants refuse to recognize this straightforward reading of the contract and instead begin their brief with a convoluted analysis based on a misunderstanding of key terms in the PAs.  The arguments contained in these sections of the WF Opposition should be entirely disregarded and dismissed.

The WF Defendants begin by focusing on each partner's capital account.  (WF Opp. at 9, 16-17).  The capital accounts the WF Defendants maintained at Thelen did not, in any way, impact the issue of whether a partner was indebted to Thelen as a result of an overpayment of Draw Advances and Loan Advances relative to Final ASNI.  Rather, each partner's capital account valued their investment in the firm itself—their equity interest.  This valuation process took into account many factors.  Among them was a partner's cash contributions and distributions, positive or negative Net Income, income or gain allocated to a partner, items of loss or deduction, among others. These factors were considered in order to determine the amount a partner was required to pay in the form of a capital contribution (though in reality a more minimal amount often was determined to be due consistent with "haircuts" instituted by the firm that had no relation to these factors) , and to otherwise quantify its equity interest. If the partner owed an amount to the firm in the form of a capital contribution, it was logical that Thelen would deduct that amount from monies it planned to pay the partner in excess Final ASNI over Draw Advances. Section 3.1.2 and 3.1.1 of the PAs explains that capital is required to be paid by the partners and Thelen may retain "as contributed capital amounts otherwise distributable to the Partners under this Agreement." There was no other relationship between the capital account and the issues here whatsoever.  Moreover, this MPSJ explicitly excludes consideration of the count

in the Complaints against Defendants that addresses capital contributions, and thus any discussion of a capital account is inapplicable to this MPSJ.

The WF Defendants also discuss negative net income, and the sections in the PAs relating to this term. (WF Opp. at 6-7, 17). Negative net income tends to be produced by firms at the beginning of their fiscal years when they have not yet billed and collected fees from clients. If the Trustee had pursued the WF Defendants for the difference between the Draw Advances and negative net income (a strange result of a transfer by transfer draw analysis), the damage claim of the Trustee against the WF Defendants as to certain months would have been much larger than the amounts sought in the Amended Complaint. Instead, the Trustee is seeking to recover based on a year-end net income number—the Final ASNI —which resulted in positive net income, albeit a number less than the Draw Advances. Therefore this Court should dispense with all arguments relating to negative net income.

The WF Defendants further exacerbate the confusion caused by the misuse of these terms by citing tax rules applicable to capital accounts and negative net income. (WF Opp. at 10-11, 22). While it may be true that, pursuant to tax rules, income is re-allocated to avoid a negative capital account, this has nothing to do with the issues here.

The WF Defendants also assert that Thelen could have determined whether or not it had net income, and how much income was available for distribution to partners "at any time," and that "[o]n a monthly basis, net income was determined and allocated to individual partners in proportion to their sharing ratios." (WF Opp. at 13-14). However, the WF Defendants acknowledge that no *actual* distribution of income was paid other than at year end, explaining "money would be available for distribution to the partner." It was only at year end that Thelen engaged in a netting process and paid out excess income over draw payments to its partners.

Sadly, the WF Defendants have wasted much of their time arguing over concepts that are inapplicable. While on numerous occasions, the Trustee's counsel has attempted to explain these terms to the WF Defendants with the assistance of the Trustee's accountant, the WF Defendants have refused to listen. Once this irrelevant and misplaced information is eliminated, it is clear that, far from being "incomplete and inaccurate" the Trustee's Netting Process is clear and precise.

### 2. The WF Defendants Have Done Nothing to Refute the Applicability of the Trustee's Case Law Regarding the Date of the Transfer

The WF Defendants attempt to distinguish *In re High Strength*[7] and *In re Tanglewood Farms*,[8] two cases cited by the Trustee in his Memorandum of Law ("**Moving Memo**"). (WF Opp. at 21-22). They focus on the factual circumstances surrounding the reconciliation or the netting, which involve improper conduct on the part of the officers and directors of the debtor. The Trustee relies on these cases for the legal proposition that reconciliation of a debtors' books and records, or a netting of one debt against another by a debtor, constitutes a transfer for purposes of section 548 of the Bankruptcy Code. The surrounding circumstances pursuant to which the reconciliation or netting occurred have little to do with the court's legal analysis. Noticeably absent from the WF Defendants' argument is an attack on the key holdings of these cases—that a reconciliation or a setoff can be a transfer.

Likewise, O'Hara and Cohen attempt to dismiss these analogous cases on other grounds. (O'Hara Opp. at 8-9; Cohen Opp. at 11-12). O'Hara and Cohen believe that, because in *Tanglewood Farms* there was no specific transfer to point to that pre-dated the reconciliation in

---

[7] *Official Comm. Of Unsecured Creditors v. Lozinski* (*In re High Strength Steel, Inc.*), 269 B.R. 560 (Bankr. D. Del. 2001).

[8] *Angell v. Montague Farms* (*In re Tanglewood Farms, Inc. of Elizabeth City*), No. 10-06719-8-JRL, 2013 WL 1619390, *4 (Bankr. E.D.N.C. Apr. 15, 2013).

question, *Tanglewood Farms* is unlike the instant one. This distinction has little impact on the Trustee's analysis. While the Trustee readily admits that the Draw Advances were a series of temporary payments, they had little if any significance as fraudulent transfers until after the Netting Process was completed.

Strangely, O'Hara claims that *High Strength*[9] "stands for the proposition that a subsequent re-characterization of previous payments may itself be a transfer because the nature of the payment was modified." (O'Hara Opp. at 9). This supports the Trustee's argument. In essence, that is precisely what is happening here. In *High Strength*, the bankruptcy court held that "reconciling" a debtors' books and records to eliminate amounts owed to the debtor constituted a "transfer of the debtor's interest in property." Here, the court should reach the same conclusion – the defendants received a "transfer of the debtor's interest in property" when the debtors' books and records were reconciled, certain overpayments were recognized, and the Defendants refused to return such overpayments. Rather than pointing out the differences between these cases and the instant case, O'Hara's analysis shows they are analogous. Similarly, Cohen's analysis seems to support the Trustee's argument: "Here, again, the 'transfer' occurred when the adjustment was mutually made by both the Debtor and the Transferee." (Cohen Opp. at 11-12). Because Defendants agreed to the PAs and the terms provided therein, and the terms of these agreements are not contested by Defendants, they should be deemed to define the time of the transfer.

Likewise, the WF Defendants fail to understand the integrated transaction doctrine. In certain of the cases discussed by the Trustee,[10] the parties to the transaction had likely intentionally structured the transaction in steps prior to it being attacked so as to avoid a

---

[9] In his Opposition, O'Hara cites this case as "High Street" but the Trustee assumes this was an inadvertent error.
[10] See Moving Memo at 11-12.

fraudulent transfer challenge.  The fact that the WF Defendants are retroactively doing the same thing through a twisted interpretation of the PAs should not alter the applicability of these cases. What is similar as between those cases and this case is that that a recovery for creditors is foreclosed based on a dissected transaction analysis.  Here, the WF Defendants seek to pull the transaction apart in order to conclude that each Draw Advance was a transfer, rather than considering the transaction as a whole.  The integrated transaction doctrine merely seeks to focus on substance and net impact of a transaction rather than its form and structure, a result that is likely uncomfortable for the WF Defendants.  As stated in *Big V Supermarkets*,[11] all the steps in the transaction are linked so that a realistic view of the entire transaction is accomplished.

O'Hara's Opposition bolsters this interpretation.  He repeatedly points out that these cases reason that a court must look to the net effect of a transaction and do not consider formally distinct steps to the detriment the impact the transaction as a whole has on creditors of the estate. (O'Hara Opp. at 11-13).  Cohen also assists the Trustee by pointing out that "collapsing" is a process in which a series of transactions is treated as a single transaction and the recipient of the transfer is sued for fraudulent transfer purposes; he also points out that this theory has been used outside the LBO context.  (Cohen Opp. at 12-14).

Receipt of the Draw Advances and Loan Advances and the Netting Process are part of one integrated transaction. As such, they show that the time of the transfer was on December 31, 2008, the Transfer Date.

### 3.    The WF Defendants Cannot Escape The Indebtedness Owed

The MPSJ does not request that a final determination be made regarding the debt owed by the Defendants to the Debtor; instead, the Trustee asks only that the time of transfer be

---

[11] *Big V Supermarkets, Inc. v. Wakefern Food Corp.* (*In re Big V Holding Corp.*), 267 B.R. 71 (Bankr. D. Del. 2001).

determined.  As a result, this Court can conclude that the netting occurred as of December 31, 2008, without reaching a determination regarding the ultimate liability of the Defendants. However, it is nevertheless clear that this determination results in the Defendants owing a debt to Thelen.

a.    <em>The WF Defendants are not Current Partners of Thelen</em>

The WF Defendants claim that, despite the fact that they received Draw Advances in excess of their Final ASNI (unlike other partners of Thelen who left prior to October 28, 2008), they have a special status and are entitled to have their debt eliminated.  In making their argument, the WF Defendants again confuse concepts of a partner's capital account balance with the Overcompensation Payments and Loan Advances.

Defendants cannot cite to any provision of the PAs that released them of the duty to pay the Overcompensation Payments and Loan Advances.  Since this suit is one to recover a fraudulent transfer, an explicit provision requiring the Defendants to pay is not needed. If excess value was transferred to the WF Defendants, the Trustee can recover these payments under sections 548 and 550 of the Bankruptcy Code.[12]  However, applying the PAs leads to the same result, and for that reason the WF Defendants cannot cite a single provision of the PAs to convincingly support their contention.  Instead, they rely on a skewed reading of limited sections of the PAs and the mere label given this group of partners in a PWC Memorandum that calls them "Dissolution Partners."[13]

---

[12] The Trustee is mindful of the fact that the PAs are being relied on by the Trustee for determination of reasonably equivalent value; however, the Trustee believes a recovery right exists outside of the confines of the PAs.

[13] The PWC Memorandum is the sole basis cited by the WF Defendants for the proposition that the Defendants are not Former Partners.  The PWC Memorandum, which states that it was to "assist [Thelen partners] in calculating any 2008 tax liability," merely states that Thelen "treated each partner who had not made an effective withdrawal prior to October 28, 2008 as being a partner (a 'Dissolution Partner') as of December 31, 2008 for tax purposes…."

The PAs support the obligation of the WF Defendants to repay the Overcompensation Payments and the Loan Advances. The WF Defendants all departed from Thelen after October, 30, 2008, and they no longer act as partners of the firm or provide legal services in that capacity. A Former Partner is defined in the PAs in relevant part as "an individual who, having been a Partner, has ceased to be a Partner for any reason." Third Partnership Agreement, Section 1.10.3; Fourth Partnership Agreement, Section 1.9.4. The WF Defendants can provide no evidence that they are current partners of the firm and that a cessation has not occurred.[14] In fact, the WF Defendants' actions, aimed at depriving Thelen of value and attacking the Trustee's efforts to repay creditors, evidence their separation from the Debtor.

Further, the fact that Thelen is in chapter 7 makes this clear. A Partner is defined in the PAs as an individual who, on such date, is a partner who has not ceased to be a partner and who has "the right to share the Net Income of the Partnership" pursuant to Section 2.1. The Debtor is insolvent, has ceased operations, and is in chapter 7 liquidation. All Net Income of Thelen has been eliminated and creditors are owed monies that cannot be repaid. As a result, the WF Defendants have no right to share in the Net Income of Thelen in this chapter 7 case. Moreover, the Trustee has a right to expel the Defendants from Thelen with or without cause under section 6.4 of the PAs as of a date fixed by the Trustee.[15] While this process seems unnecessary, the Trustee can easily evoke this provision if there is any question about the Defendants' status as Former Partners. As a result, this Court should find that the WF Defendants are not current partners of Thelen.

---

[14] All partners receive K-1s for tax purposes, including those partners who departed the firm prior to October 28, 2008. Because Thelen is a pass through vehicle, this is not inconsistent with their status a Former Partners.
[15] The Fourth Partnership Agreement also provides that upon dissolution, Sections 2.2 and 2.3, which require that a partner pay its income derived from the practice of law to the firm, cease to apply and shall be null and void. The WF Defendants cannot be permitted to maintain their status as partners so that they can eliminate their debt owed to the firm while being relieved of their responsibility to pay their income to it.

b.    *Section 7 of the Partnership Agreements Obligates the WF Defendants to Pay Creditors First*

The WF Defendants next ignore provisions of the PAs that require that creditors be paid before partners receive a distribution; they conclude that this provision is unrelated to the MPSJ issues.  Section 7.4.5.1 of the Fourth Partnership Agreement provides that "[i]n the case of a dissolution and winding up of the Partnership, the Partnership's assets shall be applied . . . First to payment of the Liabilities of the Partnership owing to third parties . . . ." The WF Defendants cannot retain Overcompensation Payments in the form of draws, a payment akin to a distribution under section 7, at a time when creditors of the firm are not being paid.  Even if the PAs were silent as to the WF Defendants' repayment obligations, section 7 makes clear that excess distributions cannot be retained by Partners at a time when creditors remain unpaid.

Finally, California partnership law does not alter this result.  The WF Defendants argue that California partnership law shields them from repaying the Draw Advances because (i) Thelen is a registered limited liability partnership and (ii) the California Partnership wind up provision obligates only non-registered LLPs to settle partnership accounts with a negative balance.  (WF Defendants Opp. at 18-19).  Even if there were a negative balance referenced in the California Partnership wind up provision, the WF Defendants' argument is misguided.  The Court does not need to "default" to California partnership law because the parties expressly addressed this issue in the PAs.[16]  The PAs explicitly provide for a netting process in section 4.2.2 and state that creditors shall be paid prior to equity holders pursuant to section 7.4.5.  In addressing this issue, the partners contracted around California partnership law as they are

---

[16] The WF Defendants even admit that "[t]o the extent that the partners fail to agree upon a contrary rule, CUPA provides the default rule."  WF Opposition at 6.  Here, it is clear that the partners expressly agreed upon a "contrary rule."

17

allowed to do pursuant to CUPA § 16306(d).[17]  Moreover, as discussed earlier, the WF

Defendants confuse the capital accounts with the Draw Advances.  The Draw Advances are not

part of the settlement of "profits and losses" addressed in CUPA § 16807(b), the provision on

which the WF Defendants rely heavily.  (WF Opp. at 19-20).  As a result, the WF Defendants'

reliance on California partnership law should not change this Court's analysis of the amounts

owed to the Debtor.

**C.**     **The Individual Value and Contributions of a Partner Are Reflected in the Point
System and the PAs Determine the Value of Each Partner's Contribution**

The WF Defendants argue that the PAs do not properly value each partner's contribution

to Thelen and that an independent analysis of the value of WF Defendants' contribution should

be made.  This Court does not need to determine the contribution that each of the Defendants

made to Thelen because the totality of the circumstances is contained in the PAs.  Instead, the

Court should only consider that: (i) an unambiguous agreement existed that defined the

compensation to be distributed to the WF Defendants for their work, and (ii) that agreement was

entered into on an arms-length basis and in good faith.  There is no dispute as to either of these

factual points.  Moreover, the WF Defendants' own statements and the WF Opposition support

this conclusion.  The WF Defendants state that:

- "To induce lawyers to come to work and provide those legal services, Thelen was

    required to offer *something* in exchange just to get the lawyer to come to work."

    (WF Opp. at 27).

- "In the case of associate attorneys and non-equity partners, the inducement was

    primarily an agreed annual salary, plus the opportunity for a year-end bonus if

---

[17] Even if the Damage Amount were a partnership liability, Section 16306(d) of CUPA explicitly provides that partners of a registered limited liability partnership may be liable for certain debts of the partnership if the partners "specifically agree to the specified debts, obligations, or liability in writing" before the debt is incurred.  Here, the parties contracted in writing to engage in the netting process.

certain criteria were met.  The situation with Partners at Thelen was different, but only slightly so."  (WF Opp. at 27).

- "Equity partners at Thelen did not work on a fixed salary, but were compensated on the basis of the value of the partnership's 'points' each partner held."  (WF Opp. at 27).

- "[A]t any given law firm, there will be a wide variety of factors that go into partner compensation decisions, but business generation invariably ranks very high on that list."  (WF Opp. at 31).

- The PAs were entered into in good faith and at arm's length. (7056-1 Statement at ¶ 22, WF Response at ¶ 22).

These factors bolster the Trustee's view that the PAs encapsulate and memorialize the value that should be paid to the WF Defendants for their services.  Likewise, O'Hara focuses on the "fair market value" of his services, including direct and indirect benefits offered by the partner to the firm, in establishing reasonably equivalent value. The market value for his services are reflected in the PAs which encompass all of these concepts. As to Cohen, he mentions his side letter which will determined at a later point in time.

The remainder of the WF Opposition is a confusing recitation of the collective contribution of this group of defendants or averages earned by the WF Defendants. The main theme is that costs necessary to generate work and/or profitability do not matter, but that instead, revenue and production numbers of the WF Defendants as a group or average numbers for these partners prove reasonably equivalent value was transferred.  (WF Opp. at 14-15, 31-33). According to the WF Defendants, this includes: (i) the total compensation, draws, and billable hours of the WF Defendants as a group, (ii) the revenue produced by the WF Defendants as a

group, (iii) the work supervised by these lawyers and the amount of revenue that work produced, and (iv) the earnings of the partners in 2009 (post-recession).  This Court should not second guess the value negotiated by the partners as set forth in the PAs and engage in a lengthy and confusing inquiry based on these factors.  Instead, this Court should respect the written, negotiated market deal entered into between the WF Defendants and the Debtor and find that the PAs establish REV.

Further, the only case discussed by the WF Defendants, *Annod Corporation v. Hamilton & Samuels*, 100 Cal. App. 4th 1286, 1295 (Cal. Dist. Ct. App. 2002), fails to support their argument.  There, a landlord sued law firm partners to recover all of their draw payments as fraudulent transfers, and the court considered the question of whether fraudulent intent could be proved.  In *Annod*, there were no triable issues of fact as to reasonably equivalent value because the partners' evidence of reasonably equivalent value was uncontroverted. After arguing that the partners were not permitted to keep the draws they were paid, and that the partnership agreement entitled them to no compensation whatsoever, the plaintiff failed to cite any portion of the relevant agreement "to show what monies the partners, whose case is before us were entitled to receive."  The court noted that because the plaintiff failed to cite any specific provisions of the agreement, it had waived its argument.  Unlike the specific provisions in the Thelen PAs regarding Final ASNI and the netting of Draw and Loan Advances against entitlements, the court in *Annod* noted that, even if the partnership agreement were to be considered, there was no provision in it that supported plaintiff's position.[18]

---

[18]  It should be noted that *Annod* involved a creditor of the debtor that was not entitled to enforce the partnership agreement. In contrast, the Trustee stands in the shoes of the Debtor with full rights to enforce the PAs against the WF Defendants.

Here the situation is the complete opposite. The Trustee's case rests on the PAs, which have been amply attached to the Knechtel Affidavit and cited in the Trustee's Memorandum of Law in support of the MSJ. These PAs support establish that the Overcompensation amounts and Loan Advances are due to the Debtor.

While O'Hara acknowledges that the Trustee has cited many cases that support his claims, he contends that, because none deal with a law firm partnership, they are of little authority. (O'Hara Opp. at 16-17). O'Hara misses the point. If the parties have agreed on an the amount of compensation or money that will be paid for goods and services, reasonably equivalent value has been established. Whether it is part of an employment contract, a divorce decree, or a land deal, no more precise value can be found than a contract price reflected by an agreement entered into an arms-length and in good faith. O'Hara also misconstrues the Trustee's argument that the *Final ASNI* constitutes REV, instead arguing that the *Draw Advances* do not constitute REV. (O'Hara Opp. at 17-18).

Finally, Cohen appears to want to adjust agreements made between parties based on the fairness of the deal and performance as illustrated in his "hypothetical example," in which "Partner A" negotiated an agreement for $2 million annual compensation, yet provided minimal services. (Cohen Opp. at 19). Mr. Cohen fails to consider that in his example, Partner A would likely be breaching the contract by failing to perform the duties required of that partner, and would thus not be entitled to receive the negotiated compensation.

Beyond that, Cohen improperly focuses on his side letter which is not within the scope of this MPSJ.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should grant (a) the MPSJ and determine that (i) the Time of the Transfer was December 31, 2008, and that (ii) REV for the Defendants services is the Final ASNI; and (b) such other and further relief as is just and proper.


Dated: New York, New York
        April 25, 2014

                                        By:    /s/ Angela J. Somers
                                               Angela J. Somers
                                               Jeffrey E. Gross
                                               Anne M. Bahr
                                               Yonah Jaffe

                                        **REID COLLINS & TSAI LLP**
                                        One Penn Plaza, 49th Floor
                                        New York, New York  10119
                                        212.344.5200 (telephone)
                                        212.344.5299 (facsimile)